NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ASHLEY GEORGES,

        Petitioner,

    v.

GREG BARTKOWSKI, et al.,

        Respondents.

Civil Action No. 10-6300

**OPINION**

**CECCHI, District Judge**

    Before the Court are *pro se* Petitioner Ashley Georges's first (ECF No. 58) and second (ECF No. 61) motions seeking reconsideration of this Court's dismissal of his amended petition for a writ of habeas corpus pursuant to Federal Rule of Civil Procedure 59(e). ECF No. 45. Respondents opposed the motions for reconsideration (ECF Nos. 59 and 62), and Petitioner replied (ECF Nos. 60 63, 65, 67). Petitioner also filed a motion reopening the time to file an appeal (ECF No. 69) and a motion requesting entry of judgment (ECF No. 70). Respondents opposed these motions. ECF No. 76. For the reasons set forth below, Petitioner's motions (ECF Nos. 58, 61, 69, and 70) are denied. Though this Court finds no basis to reconsider its earlier holdings, the Court also finds that Petitioner's substantive arguments do not merit habeas relief.

## I. BACKGROUND

    Petitioner was convicted of murder and weapons offenses after he shot and killed Kevin Jackson (the "victim") on December 4, 1999 in Newark, New Jersey. Prosecutors alleged that Petitioner murdered the victim in retaliation for the victim having shot Petitioner in the face and back

five days earlier.[1]  ECF No. 53-8 at 3.  Two witnesses testified at trial: Melvin Ward and Melanie Riddick.  *Id.* at 3–5.  Ward testified that he was directly across the street from the victim's car during the murder and that he saw a gray Honda with tinted windows and a license plate number of JJR-56R or JJR-56U.  *Id.* at 4.  Ward testified that he also saw that the shooter was a "dark man around six feet tall" wearing gray clothing.  *Id.* at 3.  Riddick, the second witness, was across the street in a second-floor apartment during the incident.  *Id.* at 4.  After hearing five or six shots, Riddick saw a man with a gun, "'brown skinned,' around six feet tall, wearing a 'skully hat,'" with "some kind of white mask that went across the nose and mouth area."  *Id.*  The "white mask" identified by Riddick (ECF No. 54-14 at 6) was consistent with the white gauze Petitioner had on the left side of his face after being shot days earlier.

Prior to trial, during the murder investigation, Daniel Baldwin, a prosecutor's office homicide investigator, went to University Hospital to determine whether anyone had sought treatment for facial injuries in the two weeks prior to the shooting, as Petitioner was alleged to have been shot days earlier.  ECF No. 54-4 at 33.  Baldwin learned that Petitioner had been treated there for gunshot wounds to the face just days earlier.  *Id.* at 34.  Baldwin thereafter presented a photo of Petitioner in a photo array to Riddick, and Riddick "distinctly remembered" Petitioner's "thick eyebrows."  ECF No. 53-8 at 5.  According to Mark Stolarz, another prosecutor's office homicide investigator, during the murder investigation Petitioner confirmed to him that on November 29, 1999, while Petitioner sat in his car in nearby Irvington, he was shot in the back and left side of his face.  ECF No. 53-8 at 5; ECF No. 54-4 at 8–14.  The Court notes that, at the murder trial, the trial judge determined that the relevant portion of Petitioner's statement to Stolarz was voluntary, based in part on the testimony of

---

[1] Bryan Jackson, the victim's brother, testified at trial to the victim's involvement in the drug trade in that area.

Petitioner's friend Eric Boating,[2] who drove him to the police station the day of the statement.  ECF No. 53-24 at 105–08.

The investigators also checked motor vehicle records and determined that Simeon Noel Jeune, Petitioner's cousin, had registered a gray Honda Accord with a license plate number of JJ**G**-56R— just one letter away from one of the license plate numbers that Ward had provided to the police and identified at trial (JJ**R**-56R).  *Id.* at 6.  Ward confirmed to the investigators that the Honda looked like the car at scene of the Jackson murder.  *Id.*  Jeune testified that although the Honda at issue was a gift from Petitioner, Petitioner was permitted to drive it and had access to the Honda on the day of the murder.  *Id.*; ECF No. 54-6 at 74.  As discussed below, Petitioner now argues that there are two alibi witnesses that could have testified to his whereabouts on the day and time of the murder: Ivory Downey, his daughter's mother, and Alfred Boateng.  ECF No. 45 at 88 (citing ECF No. 45-2 at 54).

Petitioner was convicted by a jury of murder and weapons offenses and sentenced to life imprisonment with a thirty-year parole disqualifier.  ECF No. 53-8 at 2–3.  Petitioner appealed his February 8, 2002, judgment of conviction, which the New Jersey Appellate Division affirmed on September 29, 2003.  ECF Nos. 53-5, 53-8.  The New Jersey Supreme Court denied the petition for certification on June 4, 2004.  ECF No. 53-9.

On July 29, 2005, Petitioner sought state post-conviction relief ("PCR") in the New Jersey Superior Court.  ECF No. 53-10.  That court denied Petitioner's first PCR petition on August 28, 2007 and filed an order to that effect on August 30, 2007.  ECF No. 53-15.  After communicating with the New Jersey Public Defender's office about filing an appeal on his behalf, the Public Defender ultimately filed a notice of appeal on January 9, 2008.  ECF No. 55-12 at 13; ECF No. 53-16.  The Appellate Division affirmed the first PCR denial on July 9, 2010, and the New Jersey Supreme Court

---

[2] Petitioner refers to an "Eric Boating" and an "Alfred Boateng," at times interchangeably, in numerous submissions.  The Court references these individuals as Petitioner has presented them in the record.

denied certification on November 4, 2010. ECF Nos. 53-20, 52-21, and 53-22. Petitioner thereafter

filed this habeas petition on December 1, 2010. ECF No. 1 at 52.

In its previous Opinion in this matter, this Court found that each of Petitioner's non-*Brady*

claims were time-barred, explaining as follows:

> Habeas petitions filed pursuant to 28 U.S.C. § 2254 are subject to a one year statute of limitations. *See Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013); *see also Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 84 (3d Cir. 2013). In most instances, including this one,[] that one year period runs from the date on which the judgment of conviction became final by the conclusion of direct review or the expiration of the time for seeking such review, including the ninety-day period for filing a petition for a writ of certiorari in the United States Supreme Court. *Ross*, 712 F.3d at 798; *Jenkins*, 705 F.3d at 84.

> In this matter, Petitioner's conviction became final on September 2, 2004, ninety days after his certification petition was denied. Petitioner's one-year limitations period began to run on that date. Three hundred and thirty (330) days of the one-year limitations period ran before Petitioner ultimately filed his PCR petition on July 29, 2005. Thus, at the time Petitioner filed his PCR petition, at most thirty-six[] (36) days of his one-year limitations period remained.

> The one-year limitations period, however, is subject to statutory tolling which automatically stops the running of the limitations period while the petitioner has a properly filed petition for PCR "pending" in the state courts. *Jenkins*, 705 F.3d at 85. A petition or appeal therefrom is "properly filed" only where it is filed in accordance with all state "time limits, no matter their form," *Id.* (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005)). A properly filed PCR petition will continue to be "pending" in the state courts following an adverse determination by the PCR trial court until the time during which he could have filed a timely direct appeal in the state courts has run. *See Swartz v. Meyers*, 204 F.3d 417, 420–24, 423 n.6 (3d Cir. 2000). In New Jersey, a notice of appeal for the denial of a PCR petition is due within forty-five days of the date on which the PCR petition was denied. N.J. Ct. R. 2:4-1. Although the time during which a PCR petition remains "pending" for statutory tolling purposes includes the time between an adverse trial-level determination and the filing of a timely notice of appeal, where a petitioner fails to file a timely notice of appeal, his petition ceases to be pending after the expiration of the time during which he could have filed a timely notice of appeal and does not resume "pending" status until the point at which a late notice of appeal is filed and accepted. *See Evans v. Chavis*, 546 U.S. 189, 197 (2006); *Swartz*, 204 F.3d at 423 n.6; *Thompson v. Admin. N.J. Stat Prison*, 701 F. App'x 118, 121–123 (3d Cir. 2017). Thus, where a New Jersey prisoner fails to file a timely notice of appeal under New Jersey's forty-five (45) day rule, his petition remains pending for the forty-five (45) days during which he could have filed a timely appeal from the denial of his PCR petition, but is not "pending" for tolling purposes between the expiration of the forty-five day period and his filing of late notice of appeal. *Thompson*, 701 F. App'x at 122–23.

4

Here, Petitioner's PCR petition was denied through an order filed on August 30, 2007. Petitioner's time for filing a timely notice of appeal expired forty-five (45) days later on October 15, 2007.[] As Petitioner did not file a timely notice of appeal, his one year limitations period thus began to run on October 16, 2007, and was not again statutorily tolled until his late notice of appeal was filed on January 9, 2008. During this period, eighty-six (86) more days of the one-year limitations period expired. Petitioner's time for filing a habeas petition would thereafter have been tolled until certification was denied on November 4, 2010. Twenty-seven (27) further days thereafter expired before Petitioner filed his habeas petition on December 1, 2010. Thus, four hundred and forty-three (443) statutorily un-tolled days passed between the conclusion of direct review in this matter and Petitioner's filing of his habeas petition. Absent some basis for equitable tolling, then, Petitioner's habeas petition is clearly time-barred.

The one-year habeas limitations period is subject to equitable tolling under certain limited circumstances. *Jenkins*, 705 F.3d at 88–89. The time limit should be equitable tolled "only sparingly . . . when principles of equity would make the rigid application of a limitation period unfair." *Id.* at 89 (internal quotations and citations omitted). A prisoner is therefore "entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." *Id.* (internal quotations omitted).

In his reply in this matter, Petitioner contends that he contacted the public defender's office in a timely fashion and it was simply the "mechanism" used by the public defender's office which "cause[d] delay in the filing" of his notice of appeal on PCR. ECF No. 55 at 57. Petitioner further contends that his notice of appeal should be considered timely either because of this mechanism or because his notice and appeal were ultimately considered *nunc pro tunc* by the Appellate Division.

Petitioner's argument falls far short of establishing a basis for tolling. As noted above, that a late notice of appeal is accepted *nunc pro tunc* does nothing to correct the fact that no state court PCR petition was "pending" during the intervening time and thus does not grant the petition statutory tolling which otherwise does not apply. Likewise, equitable tolling is inappropriate under these circumstances. As the transcript of the PCR [hearing] makes abundantly clear, the PCR trial court told Petitioner that his petition was being denied on August 28, 2007. *See* ECF No. 54-11. The PCR judge further informed Petitioner that he had "forty-five days to appeal" and that he could request assignment of an attorney from the public defender's office. *Id.* at 51. When asked whether he understood this timeline and his right to appeal, Petitioner stated that he did. *Id.* The documents Petitioner himself submitted show that he was directly informed by the public defender's office in late October 2007, after the forty-five (45) days had already expired, that if he left the filing of the notice up to an appellate attorney in the public defender's office, his notice would likely not be filed for "several months." ECF No. 55-1 at 13. Petitioner took no action to ensure the timeliness of his appeal, and his notice was thereafter not filed until January 2008, some fifty (50) days after his one-year limitations period had expired. It is thus clear that Petitioner was made aware of the timeline applicable to his PCR appeal, failed to file a notice of appeal on his own, and was directly told that the public defender's

5

office would likely not be able to file a timely notice of appeal – indeed, he was told
they would not even file an *untimely* notice of appeal for several months.  Given the
transparency of the situation and Petitioner's apparent inaction in the face of known
facts, this Court concludes that the "mechanism" used for filing notices of appeal in
the public defender's office in this case does not amount to an extraordinary
circumstance warranting equitable relief.  As Petitioner waited three-hundred and
thirty (30) days before filing a PCR petition in the first place, and failed to file a notice
of appeal after being informed of the timeline for doing so in this matter during his
PCR denial, this Court further concludes that Petitioner has also failed to show
reasonable diligence.  Petitioner is thus clearly not entitled to equitable tolling, and all
of the claims other than his *Brady* claim must therefore be dismissed as time-barred.

ECF No. 56 at 4–8.

Turning to Petitioner's *Brady* claim, this Court found that claim to be without merit, finding

Petitioner's claim procedurally defaulted because the state court found that Petitioner's claim was

both untimely and improperly raised. *Id.* at 9.  This Court also discussed the alleged new evidence

Petitioner wished to raise, a vague certification from a Hakim Kelly, a fellow New Jersey State Prison

inmate. ECF No. 54-19.  In that certification, Kelly avers that on December 4, 1999, while in Essex

County Jail pending drug charges, he was interviewed by law enforcement officers who told him that

he had been identified in a photo array by a woman who was a witness to a murder somewhere near

18th Avenue in Newark.  *Id.*  According to Petitioner, the failure of the State to produce these other

law enforcement officers, and of his counsel to interview them, deprived him of a fair trial.  ECF No.

45 at 33–40.

However, this Court, in rejecting Petitioner's argument, held that Kelly's certification averred

only that an unknown witness falsely identified Kelly as the killer in an unknown homicide which

occurred while Kelly was in jail.  Further, as the third PCR Judge found, the Kelly certification was

"[r]ife with speculation and hearsay upon hearsay." ECF No. 54-14 at 5.  Thus, the alleged new

evidence was neither sufficiently material nor exculpatory to make out a *Brady* claim. This Court

therefore held that the findings of the state courts rejecting the merits of Petitioner's *Brady* claim were

6

not contrary to federal law or the facts, and that even if this Court were to consider the claim on the merits *de novo*, the claim was without merit. *Id.*

## II. DISCUSSION

### A. Legal Standard

The scope of a motion to amend a judgment pursuant to Rule 59(e) is extremely limited. *See Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011). A Rule 59(e) motion may be employed "only to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* "Accordingly, a judgment may be altered or amended [only] if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [decided the motion], or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Id.* (quoting *Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.*, 602 F.2d 237, 251 (3d Cir. 2010)). In this context, manifest injustice "generally . . . means that the Court overlooked some dispositive factual or legal matter that was presented to it," or that a "direct, obvious, and observable" error occurred. *See Brown v. Zickefoose*, No. 11-3330, 2011 WL 5007829, at *2, n.3 (D.N.J. 2011).

### B. Analysis

#### 1. Petitioner's First Motion for Reconsideration

In his initial reconsideration motion, Petitioner first argues that, because he filed his PCR petition in state court before the Supreme Court decided *Evans v. Christie*, which this Court cited in dismissing his claims as time-barred, *Evans* does not apply to his habeas petition. Petitioner instead contends that this Court should apply *Carey v. Saffold*, 536 U.S. 214 (2002), to his petition. Even if Petitioner's contention that *Evans* did not apply to him were accurate, which it is not, that argument would provide Petitioner no relief. First, *Carey* is in no way contrary to or in disagreement with *Evans*. In *Carey*, as Petitioner himself quotes, the Supreme Court merely held that where a timely

7

notice of appeal is filed in a PCR proceeding, a PCR petition remains pending during the time between the conclusion of trial court level review and the filing of the timely notice of appeal. 536 U.S. at 219. *Carey* is entirely silent, however, as to how the *untimely* filing of a notice of appeal affects whether a PCR petition is "pending" for AEDPA tolling purposes.

The Third Circuit addressed that question in *Douglas v. Horn*, 359 F.3d 257, 262 (3d Cir. 2004) (citing *Swartz v. Meyers*, 204 F.3d 417 (3d Cir. 2000)), and the Supreme Court followed suit in *Evans*, clarifying that a state court PCR petition does not remain pending where a petitioner fails to file a timely notice of appeal, and that, under *Carey*, "only a *timely* appeal" will provide statutory tolling during the period between a lower court PCR ruling and an appellate court's consideration of the issue. *Evans*, 546 U.S. at 197 (emphasis in original). Regardless, because *Horn*, which applies to habeas cases, was decided prior to Petitioner's filing of his state court PCR petition, Petitioner was subject to the rule this Court applied. Petitioner's habeas limitations period was not tolled between the denial of his PCR petition and his untimely notice of appeal, and his non-*Brady* claims remain time-barred. Accordingly, Petitioner's *Carey* argument provides no basis for reconsideration.

Petitioner next argues that he was not provided a "fair opportunity to present his arguments in this matter" because Respondents did not file a motion to dismiss the habeas petition as untimely, but instead filed an answer which contained their argument as to the time-barred nature of Petitioner's habeas petition, and that Respondents did not fully explain in their answer the availability of equitable tolling, preventing Petitioner from addressing that issue. Although Petitioner makes much of the mechanism used by Respondents, that argument provides no basis for relief. Respondents clearly raised the time-bar issue and placed Petitioner on notice that he should address any basis for avoiding the time-bar in his reply. Petitioner was thus aware of the issue and should have raised any argument regarding the timeliness of his claims at that time. Petitioner's alleged failure to realize he could argue equitable tolling provides no basis for reconsideration.

Petitioner blames the 330-day period during which he failed to file his initial PCR petition on his prior counsel, who he argues was distracted by a family illness and should have filed a PCR petition on his behalf. Even if Petitioner's suggestion that counsel is to blame is accepted, Petitioner clearly knew of these issues long before the briefing in this matter. By Petitioner's own admission, he knew of the issue when he filed his *pro se* PCR petition in 2005. Petitioner could have, but did not, raise this issue previously in this matter, and this argument therefore provides no valid basis for reconsideration. *See Hernandez v. United States*, 608 F. App'x 105, 109 (3d Cir. 2015) (finding that a party is "not entitled to reconsideration based on information that was previously available to him [as] '[t]he purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence'").

Petitioner also presents an argument for equitable tolling, disagreeing with this Court's finding that the Public Defender's mechanism for handling PCR appeals provides no basis for equitable tolling. However, AEDPA's one-year limitations period may be equitably tolled only in extraordinary cases. *Holland v. Florida*, 560 U.S. 631, 649–50 (2010). Equitable tolling requires a petitioner to establish: (1) diligent pursuit of rights; and (2) extraordinary circumstances preventing a timely petition. *Id.* at 649; *Severs v. Att'y Gen. of New Jersey*, 793 F. App'x 72, 74 (3d Cir. 2019), *cert. denied sub nom. Severs v. Grewal*, 140 S.Ct. 829 (2020). Even if the first condition is satisfied, the second is not.

As this Court held in its underlying Opinion, the first PCR court informed Petitioner on the record on August 28, 2007, that the Petition would be denied, and that he had forty-five days to appeal. ECF No. 54-11 at 51 (Tr. 98). Despite failing to attach it to his original motion,[3] Petitioner now attaches a self-prepared "notice of appeal and assignment of counsel" dated August 29, 2007. ECF

---

[3] In his original motion, Petitioner attached only the Public Defender's response to Petitioner's September 30, 2007, letter.

No. 58-1. According to a September 30, 2007 letter from Petitioner to the Public Defender that included the notice of appeal, Petitioner "filed an appeal with the Appellate Division on August 29, 2007." ECF No. 58-1 at 8. Petitioner "called the Clerk's Office at the Appellate Division to inquire about the status" because he had not received any notification after filing. *Id.* Petitioner spoke with a clerk, who informed him that they could not process the appeal because of a "number of deficiencies." *Id.* The letter also alleges that Petitioner previously sent that notice to the Public Defender, though there is no record of that correspondence attached.

Notably, there is no stamped copy of a notice of appeal, notice of rejection, or anything similar to support Petitioner's contention. There is only the letter dated September 30, 2007, which was roughly two weeks before Petitioner's time to file a notice of appeal expired. Even if this Court found that Petitioner diligently pursued the notice of appeal, "equitable tolling typically applies when the petitioner has in some extraordinary way . . . been *prevented* from asserting his or her rights." *Severs*, 793 F. App'x at 74–75 (3d Cir. 2019). To the extent that the Public Defender's handling of the PCR appeal contributed to the filing delay due to a backlog in case management, "this 'garden variety' delay was nothing more than 'excusable neglect,' which is hardly extraordinary." *Id.* at 75 (citing *Holland*, 560 U.S. at 651–52).

Petitioner next argues that the state courts incorrectly addressed his *Brady* claim as a motion for a new trial under state law, and that this Court therefore should have addressed his *Brady* claim *de novo* and granted him relief. Petitioner's argument, however, ignores the fact that the standard applied by the state courts to motions for a new trial under state law is essentially identical to the materiality requirement applicable to *Brady* claims, and that the Appellate Division did therefore address the *Brady* claim.

Even if this Court were to consider Petitioner's *Brady* claim *de novo*, it nevertheless fails for the reasons this Court explained in its previous Opinion—the certification at issue, provided by

Hakim Kelly, is neither material nor exculpatory. Specifically, as discussed above, Hakim Kelly's certification is so ambiguous such that it is unclear if the alleged facts asserted therein, including those related to a supposed witness to an unidentified murder, implicate Petitioner's case. As such, the certification is wholly extraneous to this matter and "patently insufficient to affect the outcome of Petitioner's trial in light of the strong evidence of his guilt." ECF No. 56 at 10–11. Petitioner's argument fails to show that this Court was mistaken in rejecting Petitioner's *Brady* claim on the merits, and Petitioner is therefore not entitled to reconsideration on this basis. Petitioner thus presents no valid basis for reconsideration in his initial motion or related reply, and Petitioner's initial reconsideration motion (ECF No. 58) is denied.

## 2. Petitioner's Second Motion for Reconsideration

While Petitioner's first reconsideration motion was pending, Petitioner filed a second motion for reconsideration. ECF No. 61.[4] In that motion, Petitioner purports to compare his case to a wholly different matter decided recently by the New Jersey Appellate Division in *State v. Baker*, No. A-0716-17T3, 2019 WL 7187443 (N.J. App. Div. Dec. 26, 2019). Petitioner seeks to use this case to reassert many of his underlying arguments, which this Court previously dismissed as either time-barred or meritless.

Initially, the Court notes that Petitioner's second motion for reconsideration was filed considerably more than twenty-eight days after this Court entered the judgment Petitioner seeks to challenge. Indeed, this Court dismissed Petitioner's petition on August 22, 2019, and Petitioner did not file his motion until February 18, 2020, six months after the dismissal of this case and two months after the Appellate Division decided the case upon which he now seeks to rely. Motions seeking reconsideration of a final order or decision pursuant to Federal Rule of Civil Procedure 59(e),

---

[4] The Court construes this as a second motion for reconsideration of the dismissal of his habeas petition as it presents new material and arguments from those contained in his first such motion.

however, must be filed within twenty-eight days of the entry of that decision. Fed. R. Civ. P. 59(e); Local Civ. R. 6(b)(2); *see also Smart v. Aramark, Inc.*, 618 F. App'x 728, 730 n.3 (3d Cir. 2015). Petitioner's second motion is thus untimely and is denied as such. *Smart*, 618 F. App'x at 730 n.3.

Even assuming *arguendo* that this motion was timely filed, Petitioner has nevertheless failed to present a valid basis for reconsideration. Petitioner's motion in no way shows that this Court made any clear error of fact or law, and the case Petitioner now seeks to rely upon is distinguishable from this matter. Specifically, in *Baker*, the court held that a defendant should be granted a new criminal trial following a conviction only if the defendant presents newly discovered *and substantiated* evidence that is potentially exculpatory. 2019 WL 7187443, at *21–26 (finding forensic ballistics evidence and a 911 tape to be substantiated and potentially exculpatory warranting a new trial). Here, however, as discussed below, Petitioner has failed to present any substantiated evidence that is potentially exculpatory, as each of the certifications at issue are either irrelevant to this case or are patently inconsistent with the trial record. Thus, even if Petitioner's second motion was timely, Petitioner has failed to present any valid basis for reconsideration, and his second motion (ECF No. 61) is therefore denied as both untimely and without merit.

### 3. Petitioner's Substantive Arguments

While the Court adheres to its original determination regarding timeliness, Petitioner's non-*Brady* claims—that is, all claims other than Ground Two—nevertheless do not merit habeas relief. Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Price v. Vincent*, 538 U.S. 634, 641

(2003). District courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

Federal law is "clearly established" for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

To the extent that nearly all of Petitioner's arguments address the alleged ineffective assistance of trial and appellate counsel, the Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *Id.* at 687. First, the defendant must "show that

13

counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The court must then determine whether, considering all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness." *Hinton v. Alabama*, 571 U.S. 263, 264 (2014).

Second, a petitioner must establish that counsel's "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 669. To establish prejudice, the defendant must show that there is a reasonable probability that the result of trial would have been different absent the deficient act or omission. *Id.* at 687. On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington*, 562 U.S. at 101.

To position Petitioner's arguments in their proper context, the Court first notes its agreement with the Appellate Division's decision on Petitioner's direct appeal, which detailed the "overwhelming" evidence of defendant's guilt:

> Ward's description of the grey Honda with tinted windows in which the shooter fled the scene of the murder, including his identification of two license plate numbers, one of which differed by only one letter from the license plate number of the car registered in the name of defendant's cousin, established beyond any reasonable doubt that that car was the getaway car. In addition, the discovery in that car of a white gauze bandage containing DNA that matched defendant's DNA, together with the cousin's testimony that defendant had access to the car, established beyond a reasonable doubt that defendant used the car around the time of the murder. In light of this evidence and Riddick's testimony that she knew defendant before the murder and the distinctive "white mask" Riddick saw the shooter wearing, the jury could reasonably have found Riddick's identification of defendant to be highly credible, even though her testimony was inconsistent in some respects with Ward's testimony.

ECF No. 53-8 at 11.

### a.  Ground One: Failure to Seek *Wade* Hearing for Riddick Identification

In Ground One, Petitioner alleges that trial counsel was ineffective in waiving a *Wade* hearing, arguing that challenging the identification by Melanie Riddick, one of the witnesses to the Jackson shooting, would have led to its suppression. ECF No. 45 at 18; ECF No. 45-1 at 13. Petitioner argues that Riddick's identification violated Petitioner's due process rights because she was admittedly high on drugs when she observed Petitioner, did not have her glasses on when she observed him, and did not provide a prior description of Petitioner. Petitioner also argues that the identification impermissibly occurred at Riddick's apartment when Detective Baldwin knew Petitioner was at the Prosecutor's Office giving a statement about his own shooting and that the photo of Petitioner had a marking on it. ECF No. 45 at 4–15.

"[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012). However, "[e]ven when the police use such a procedure . . . suppression of the resulting identification is not the inevitable consequence." *Id.* at 239. Instead, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)). "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 240 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). "The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 114; *United States v. Gatto*, 924 F.2d 491, 498 (3d Cir. 1991). If the "indicators of [a witness'] ability to make an accurate identification are [] outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. *Manson*, 432 U.S. at 116.

15

Petitioner raised some version of this argument as early as his first direct appeal, and in his PCR petition. ECF No. 53-8 at 7. In denying the argument, the Appellate Division held that, "in light of . . . Riddick's testimony that she knew [Petitioner] before the murder and the distinctive 'white mask' Riddick saw the shooter wearing, the jury could reasonably have found Riddick's identification of [Petitioner] to be highly credible, even though her testimony was inconsistent in some respects with Ward's testimony." ECF No. 53-8 at 11. There is no indication that this finding was contrary to federal law or otherwise incorrect. The Appellate Division, affirming the denial of Petitioner's PCR petition, also determined that the *Wade* argument lacked sufficient merit. ECF No. 53-20 at 5.

First, as the Appellate Division held, any risk of misidentification was minimized by Riddick's familiarity with Petitioner, having seen him at her apartment building a number of times over the course of a few months before the murder. ECF No. 54-3 at 12 (Tr. 19–20). Moreover, while at one point when Riddick observed the incident, the distance between Petitioner and Riddick was about forty-six feet, a distance for which Riddick would normally have required glasses to see, Petitioner was at one point as close as Riddick's living room window. *Id.* at 25, 37 (Tr. 45–46, 69).

Second, as Respondents argue, the array of photos shown to Riddick was not impermissibly suggestive. Detective Baldwin testified that he arranged the photo array shown to Riddick to include photos of people with similar physical characteristics as Petitioner. ECF No. 54-5 at 22–23 (Tr. 39–42). Riddick, attempting to recreate how she observed Petitioner, "placed her hand over the mouth section . . . simulating how the mask was on the individual she observed that night." *Id.* Riddick expressed certainty based on a unique feature: Petitioner's "thick eyebrows." *Id.* at 23 (Tr. 42); ECF No. 54-3 at 16–18 (Tr. 28–32).

Further, contrary to Petitioner's argument, there is no indication that Riddick saw any markings on Petitioner's photo. *Id.* During her testimony, Riddick also did not mention any other undue influence, such as, for example, urging from investigators to pick a specific photo (or any at

all). *Id.* at 19 (Tr. 33). Accordingly, the procedure was not unduly suggestive, or unreliable. *Abrams v. Barnett*, 121 F.3d 1036 (7th Cir. 1997) (finding that a "showup" identification, even if unduly suggestive, was sufficiently reliable to satisfy due process, in view of other indicia of reliability: clear view of perpetrator throughout shooting, familiarity with defendant, temporal proximity to shooting).

Finally, the record reveals that trial counsel made a defensible tactical decision: forego a *Wade* hearing in favor of cross-examination and closing argument attacking the reliability of Reddick's identification based on her admitted, contemporaneous drug use. ECF No. 54-7 at 11 (Tr. 17, *et seq.*). Thus, the state courts' decisions rejecting Petitioner's *Wade* argument were not an unreasonable application of the *Strickland* standard. *Page v. Bartkowski*, No. 11-2558, 2014 WL 1942357, at *18 (D.N.J. May 14, 2014) (noting that defense counsel explicitly waived a *Wade* hearing, stating that, "strategically," he preferred to cross-examine these witnesses at trial, without giving them a "trial run" in a pretrial hearing). Accordingly, even if this claim had been timely, it would nevertheless fail to merit habeas relief.

### b. Grounds Three and Six(B): Due Process Challenge to Trial Court's Determination that Petitioner's Statement to Police was Voluntary and Related Ineffective Assistance of Counsel Claim

Petitioner was himself shot about one week before the separate shooting for which he was convicted. He argues that the statement he gave to police was involuntary because police lured him to the station under the pretext of investigating the earlier shooting, where he was the victim, but in fact it was to question him regarding the shooting of Jackson. ECF No. 45 at 40; ECF No. 45-1 at 22. Under Ground Six(B), Petitioner argues that trial counsel was insufficiently prepared for the *Miranda* hearing.

To be admissible for any purpose, a statement of an accused must be "voluntary," *i.e.*, essentially free, not the product of any force, threats or promises by the government. *Arizona v.*

*Fulminante*, 499 U.S. 279, 287–88 (1991). The voluntariness of a statement is determined by judging the totality of the circumstances. *United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993). In determining whether a statement is voluntary, a court must examine whether the statement was "the product of an essentially free and unconstrained choice by its maker, [whether] it was the product of rational intellect and free will, and [whether the accused's] free will was not overborne." *United States v. Bethancourt*, 65 F.3d 1074, 1078 (3d Cir. 1995), *cert. denied*, 516 U.S. 1153 (1996).

Any factual determination made by a state court, such as the trial court's determination after the *Miranda* hearing, is presumed correct. 28 U.S.C. § 2254(e)(1). "Both Congress, in passing the AEDPA, and the Supreme Court, in construing it, have made pellucid that a federal habeas proceeding should not be used as an occasion for a retrial of the state court case." *Pike v. Guarino*, 492 F.3d 61, 70 (1st Cir. 2007), *cert. denied*, 128 S.Ct. 716 (2007). Thus, "[w]here . . . a federal district court sitting in habeas jurisdiction essentially replicates the entirety of the relevant state court evidentiary record, it is on very shaky ground." *Id.*; *see also Thatsaphone v. Weber*, 137 F.3d 1041, 1046 (8th Cir. 1998) (suggesting that the district court "went beyond its habeas authority when it heard testimony rehashing what occurred at the [state court proceeding] and then reweighed the state court's fact findings").

As the first PCR court determined, Petitioner's PCR counsel made the same argument unsuccessfully before the Appellate Division on direct appeal, which affirmed the trial court's determination "for the reasons expressed in the trial court's oral opinion of November 30, 2001." ECF No. 54-11 at 8; ECF No. 53-8 at 8. Petitioner does not identify, and this Court does not find, any way in which this was factually incorrect or decided contrary to federal law.

In relevant part, the trial judge, after hearing argument out of the jury's presence, determined that the relevant portion of the statement was voluntary. ECF No. 53-24 at 105–08. Specifically, the trial court found that Petitioner himself testified that he had willingly driven to the police station to

give the police a statement about the shooting in which he was a victim, at one point left, and upon returning "knew he had a choice to either give a statement or not give a statement and that he gave the statement because he wanted to give the statement." *Id.*

The record supports the trial judge's holding. Petitioner agreed that he came to give a statement voluntarily and had a choice as to whether to give police a statement when he was brought back into the building. *Id.* at 83. He testified that he was uncomfortable but was "gonna give [the statement] anyway." *Id.* Petitioner's friend Eric Boating, who drove Petitioner to the station, described officers who brought Petitioner back into the building as "hostile," "accosting," and "intimidating," but nevertheless described Petitioner as "very amicable" and having "no resistance to doing what he had been called upon to do." *Id.* at 89, 98.

According to Petitioner, he was lured to the police station and induced to give a statement under false pretenses because Investigator Stolarz knew that Petitioner was a suspect in the shooting for which he was later convicted. However, as the trial judge found, the record indicates that Petitioner was questioned about the earlier shooting in which he was a "victim." *Id.* at 107, 108. It was only later that day that Reddick's identification (supplementing Ward's earlier identification) triggered Petitioner's arrest and a *Miranda* warning. *Id.* at 48, 55. Until that point, Petitioner was asked questions about "past events . . . in the area [such as] six homicides that week." *Id.* at 72.

Finally, even if the record supported Petitioner's factual assertions, including any indication that police somehow deceived him, "a falsehood by a police officer, although deplorable, does not necessarily induce an involuntary confession." *McNeal v. Rdo*, No. 88-3435, 1988 WL 108440, at *4 (S.D.N.Y. Oct. 6, 1988) (holding that petitioner was not improperly induced to confess by police officer's attempt to convince him that the polygraph machine was infallible), *aff'd*, 888 F.2d 126 (2d Cir. 1989), *cert. denied*, 493 U.S. 1030 (1990) (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (police misrepresentations as to co-suspect's admissions not sufficient under totality of circumstances

to conclude confession was involuntary); *Miller v. Fenton*, 796 F.2d 598 (3d Cir. 1986), *cert. denied*, 479 U.S. 989 (1986) (lying about time of victim's death not "sufficient trickery" to overcome defendant's will).

Finally, as to Petitioner's related ineffective assistance of counsel claim, there is nothing in the record to support that conclusion. Trial counsel apparently recognized that some discovery was missing, and pushed for complete discovery and a *Miranda* hearing. Petitioner does not identify which documents he believes are missing or might be helpful to support his defense, or any other beneficial information, including from Eric Boating (who testified at the *Miranda* hearing) which his counsel could have procured before the hearing. Accordingly, even if this claim was timely, it would still have been unsuccessful.

### c. Grounds Four and Six(A) and Six(D): Ineffective Assistance of Trial and Appellate Counsel Related to the Seizure of the Honda

In the Amended Petition, Petitioner argued that trial counsel was ineffective for failing to move to suppress the 1986 Honda Accord owned by his cousin Simeon Noel Jeune and seized at his residence, and by extension the bloody gauze containing Petitioner's DNA which tied Petitioner to the crime. ECF No. 45 at 46; ECF No. 45-1 at 27. According to investigators, Jeune revealed to them that Petitioner had borrowed the Honda during the murder and left a bloody gauze pad used on his own gunshot wound sustained days earlier. ECF No. 53-18 at 76–77. In support, Petitioner highlights Jeune's affidavit, filed with his first PCR petition several years after trial, denying any mention of the gauze to police. ECF No. 45-2 at 91–92. However, because investigators would have been justified in seizing and searching the vehicle even without any mention of gauze, Petitioner's argument is unavailing.

Any claim of ineffective counsel related to a suppression motion must demonstrate that the underlying Fourth Amendment claim is meritorious. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). No warrant is necessary for a search if the government believes the delay could result in loss

of the evidence sought because a friend or accomplice of the suspect was aware of the police interest in the car. *United States v. Gaudin*, 492 F.2d 132 (5th Cir. 1974) (no warrant necessary to search vehicle where exigent circumstances exist); *United States v. Evans*, 481 F.2d 990 (9th Cir. 1973). Courts have also upheld exigent searches of parked cars whenever a friend or family member of the defendant was aware of the police interest in the defendant or the car. *United States v. Evans*, 481 F.2d 990 (9th Cir. 1973); *Carlton v. Estelle*, 480 F.2d 759 (5th Cir. 1973); *State v. LaPorte*, 62 N.J. 312 (1973). So, too, have courts permitted warrantless searches even after officials seized a vehicle. *See, e.g.*, *Michigan v. Thomas*, 458 U.S. 259 (1982) (warrantless search of car was permissible if search fell within the automobile exception even where the search was conducted after the car was impounded and had been in police custody); *United States v. Frank*, 864 F.2d 992 (3d Cir. 1988) (search occurred five days after car was impounded); *United States v. Burton*, 288 F.3d 91, 101 (3d Cir. 2002) ("For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.") (quoting *Chambers v. Maroney*, 399 U.S. 42, 52 (1970)). As Respondents argue, Petitioner cannot demonstrate prejudice because the officers would have been justified in seizing or searching the Honda at any point after Jeune acknowledged that Petitioner had access to the Honda, which Ward had identified as being present at the murder. ECF No. 45-2 at 91; ECF No. 54-6 at 45 (Tr. 84–85). Accordingly, because the search was lawful, any motion to suppress would ultimately have been fruitless, and is thus not a basis for habeas relief.

### d. Ground Five: Waiver of Right to Testify

Petitioner also challenged what he characterizes as his counsel's waiver of Petitioner's right to testify in his own defense. Petitioner asserts that the jury was prevented from fully understanding that the severity of Petitioner's injuries from the earlier shooting made it impossible for him to have

21

committed this murder and that Petitioner had an alibi. ECF No. 45 at 35; ECF No. 45-1 at 29. Petitioner argues that he was "confused by trial counsel's announcement that he was seeking to charge the jury that Petitioner would not be testifying" and "befuddled and instantly placed in a conundrum of how to respond," and as a result simply followed his counsel's "independent decision" not to permit Petitioner to testify. ECF No. 45 at 35.

A criminal defendant has the constitutional right to testify or decide not to testify. *Rock v. Arkansas*, 483 U.S. 44, 49–53 (1987). The right is personal and can be waived only by a defendant, after consultation with his lawyer. *United States v. Pennycooke*, 65 F.3d 9, 10 (3d Cir. 1995). Respondents do not dispute that Petitioner had a constitutional right to testify on his own behalf. As Petitioner recognizes, however, the trial court advised him of that right. In a statement quoted by Petitioner himself, the trial court informed Petitioner that the "ultimate decision [whether to testify] is not [trial counsel's] decision," but Petitioner's. ECF No. 45 at 35. The trial court further expressed its hope that Petitioner's decision "is not a decision [made] without any thought." *Id.* In response, Petitioner nevertheless declined to testify. *Id.*

As the first PCR court found, this was sufficient to advise Petitioner of his constitutional rights. Nothing more could have been done in the matter lest the trial court have risked intruding on the attorney-client relationship; "as a general matter . . . it is inadvisable for a court to question a defendant directly about his or her waiver of the right to testify." *Pennycooke*, 65 F.3d at 11. To the extent that Petitioner argues that he also raised this issue at sentencing, as noted above, the trial court had previously informed him of his constitutional right to testify at trial. The fact remains, however, that there is no indication that Petitioner was denied his constitutional rights, or was the victim of any other constitutional or factual error with respect to his decision not to testify. Accordingly, there is no basis for any habeas relief on this ground.

### e. Ground Six: Ineffective Assistance of Counsel

In addition to the bases for ineffective assistance of counsel discussed above, Petitioner also argues that his counsel's failure to investigate and interview Bryan Jackson, the victim's brother, allowed the State to present a "prejudicial and false account[] of the evidence to bolster the State's . . . drug dealing dispute" theory, which was ultimately one of the avenues used by the jury to connect Petitioner to the victim. ECF No. 45 at 64. Petitioner also claims that counsel did not have Bryan Jackson's statement to the police, which supposedly refuted the drug dispute theory. Nevertheless, Bryan Jackson's testimony regarding his brother's (the victim's) involvement in the drug trade, the victim's possession of a sawed-off shotgun and bullets, and evidence that Petitioner earlier had been shot nearby at 18th Avenue and Columbia Street, provided evidence from which the jury could infer that Petitioner's motive in shooting the victim was in retaliation for the victim having shot Petitioner, whether or not drugs were involved.

The Appellate Division, in Petitioner's direct appeal, held that Petitioner "overstates the possible prejudicial impact of this evidence," explaining that:

> The court did not allow Bryan to testify about the contents of his conversations with the victim, and the State did not present any direct evidence that [Petitioner] was involved in drug trafficking or that he and the victim had any dealings before the murder. Most significantly, [Petitioner] does not challenge the admissibility of evidence that he was shot in the face in the same neighborhood only five days before the Jackson murder. Consequently, the jury could have readily inferred that [Petitioner's] motive for the killing was his belief that Jackson had been involved in that shooting, regardless of either Jackson's or [Petitioner's] involvement in drug trafficking. Therefore, the court did not abuse its discretion in admitting evidence of the victim's involvement in drug trafficking in the area of the murder, and in any event the admission of this evidence was not clearly capable of producing an unjust result.

ECF No. 53-8 at 15–16.

Similarly, insofar as Petitioner argues that he and the victim were shot in different neighborhoods, as the first PCR court told Petitioner, the distance between the shootings was eleven blocks, a distance sufficiently close for a jury to draw a connection. ECF No. 54-11 at 16–19 (Tr. 29–34). The PCR court ultimately rejected Petitioner's entire line of argument

relating to Bryan Jackson's testimony for essentially the same reasons expressed by the Appellate Division in Petitioner's direct appeal. *Id.* Nothing in Petitioner's papers indicates that these issues were decided contrary to federal law or factually incorrect. Accordingly, even if this argument had not been untimely, it would nevertheless have been rejected.

### i. Alibi Witnesses

Petitioner also originally argued that he informed trial counsel before trial of two alibi witnesses that could testify as to his whereabouts on the day and time of the murder: Ivory Downey, his daughter's mother, and Alfred Boateng, a family friend. ECF No. 45 at 88 (citing ECF No. 45-2 at 54). Petitioner's alibi arguments as to Downey were rejected in Petitioner's first and third PCR opinions. In relevant part, the first PCR court noted that Downey's certification was incredible given that it was not produced until nearly eight years after the shooting despite the close relationship between Downey and Petitioner. ECF No. 54-11 at 50 (citing ECF No. 53-14 at 27). As the Appellate Division held in Petitioner's first PCR appeal, Downey's certification "only accounts for [Petitioner's] whereabouts on the day of the shooting generally," does not account for the entire day, and does not aver Downey or Petitioner's knowledge that trial counsel knew of the alibi. ECF No. 53-20 at 5–6.

It is unclear from the record whether Alfred Boateng's certification was submitted to the third PCR court, meaning that it would be an unexhausted claim subject to dismissal on that basis. However, even if it had been exhausted, it would nevertheless fail to satisfy the habeas standard.

Alfred Boateng's one-page certification, dated July 28, 2016, states that he was with Downey and Petitioner at their home on the day of the murder watching football between 1:00 pm. and 9:00 p.m. ECF No. 45-2 at 52. Alfred Boateng claims to have called trial counsel "when [Alfred Boateng] found out that [Petitioner] was charged with murder" and expressed his willingness to testify. *Id.* Petitioner does not explain why Alfred Boateng's certification was not signed until August of 2016,

nearly eighteen years after the murder and one month before his third PCR was denied. *Id.* Nor does he explain why Downey's certification, prepared about nine years prior to Alfred Boateng's, made no mention of Alfred Boateng's presence. And finally, if Alfred Boateng had informed Petitioner and/or trial counsel of his willingness to testify as an alibi witness, that issue surely would have arisen in one of Petitioner's first two PCRs. *See, e.g., Freeman v. Trombley*, 483 F. App'x 51, 60 (6th Cir. 2012) (no actual innocence claim where affidavit of petitioner's girlfriend was signed fifteen years after murder despite being known to petitioner at trial and earlier post-conviction proceedings because she was an interested witness who jury may have disbelieved).

Even if the allegations of the alibi witnesses are true, however, and the Court were to presume ineffective assistance of counsel, Petitioner would nevertheless have to satisfy the second *Strickland* prong and demonstrate prejudice; that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome . . . that counsel's deficient performance impacted only one juror's verdict." *Massey v. Superintendent Coal Twp. SCI*, No. 19-2808, 2021 WL 2910930, at *5 (3d Cir. July 12, 2021) (internal citations and quotation marks omitted).

Neither alibi witness would satisfy this prong as their proposed testimony would not change the outcome of this case. *Foster v. Ward*, 182 F.3d 1177, 1186 (10th Cir. 1999); *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009) ("Weighed against . . . eyewitness testimony . . . , these affidavits do not establish that no reasonable factfinder would have found the applicant guilty of the underlying offense; it is the black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar."). Downey's certification would not succeed for its age, ambiguity, and the fact that Downey was, and remains, an interested witness. As for Alfred Boateng's certification, the Court notes that the age issue is even more glaring for him. Further, the

timing of both "would be subject to intense cross-examination at trial." *Foster*, 182 F.3d at 1186. The Court finds both certifications additionally problematic as they are inconsistent with each other. As noted above, in these certifications, both Alfred Boateng and Downey allege that they were with Petitioner at Petitioner's home during the time of the murder, but they fail to reference each other's presence (ECF No. 45-2 at 52–53). Accordingly, even if this claim had been timely, it would not have proven meritorious.

> ### ii.   Crime Scene Investigation – Alleged Ineffective Assistance of Counsel for Failing to Travel to the Crime Scene and/or Hire a Crime Scene Reconstruction Expert

Petitioner also argued that trial counsel should have retained and called a crime-scene reconstruction expert to prove that Ward's testimony was unreliable. However, as Respondents argue, this is a strategic decision entrusted to counsel's sound judgment. *Henderson v. DiGuglielmo*, 138 F. App'x 463, 470 (3d Cir. 2005) ("Counsel's decision not to introduce testimony potentially in conflict with the central defense strategy is not unreasonable.") (citing *LaFrank v. Rowley*, 340 F.3d 685 (8th Cir. 2003) (counsel's alleged ineffectiveness for failure to call a witness was evaluated under *Strickland* and, because it was a "matter of trial strategy," found to be reasonable)); *Morrow v. Ignacio*, 183 F. App'x 653 (9th Cir. 2006) (defense counsel's failure to file for certain discovery, call certain witnesses, ask certain questions on cross-examination, or make certain arguments, and counsel's method of impeaching a prosecution witness, were methods of case presentation and tactical decisions that were within counsel's professional judgment, and were entitled to great deference on claim of ineffective assistance).

Here, as Respondents argue, the record reflects strategic judgment by trial counsel to focus on challenging the witnesses' testimony rather than calling superfluous witnesses. Counsel questioned Ward's eyesight, discrepancies in testimony, and uncertainty about the Honda's license plate number.

ECF No. 54-7 at 8–10 (Tr. 12–15), 16 (Tr. 27–28). Accordingly, even if this claim were timely, it would nevertheless fail to meet habeas standards.

### 4. Subsequent Letters and Motions

#### a. Timeliness

Petitioner purports to make new arguments that his AEDPA claims are timely in successive letter briefs filed after his second motion for reconsideration. ECF Nos. 65, 67. Petitioner's claims, however, lack merit. Relying upon *Evans v. Chavis*, 546 U.S. 189, 198 (2006), Petitioner argues that this Court should have considered his PCR appeal timely because the Appellate Division accepted and decided that appeal.[5] ECF No. 67 at 2–3. According to Petitioner, the fact that the Appellate Division denied the PCR appeal on the merits and without addressing its timeliness issues means that it should be considered timely, and therefore that the AEDPA deadline was tolled from his initial PCR denial through his late appeal of that denial. However, the PCR appeal cannot be considered timely merely because the Appellate Division considered the merits. Rather, if a state court fails to rule clearly on the timeliness of a PCR application, as the Appellate Division did here, "a federal court must . . . determine what the state courts would have held in respect to timeliness." *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 85–86 (3d Cir. 2013) (quoting *Evans*, 546 U.S. at 198). Here, as discussed above, this Court has already determined that Petitioner's PCR appeal was untimely under applicable New Jersey law, because it was filed past the 45-day deadline. N.J. Ct. R. 2:4-1; *see* ECF No. 56 at 4–8; *State v. Redding*, No. A-4150-18, 2021 WL 867005, at *3 (N.J. Super. Ct. App. Div. Mar. 9, 2021) (finding PCR appeal untimely because it was not filed within 45 days of the lower court's order).

---

[5] As noted above, the one-year AEDPA deadline is tolled when a properly filed post-conviction petition is pending.

Petitioner also appears to argue that a recent ruling by the California Supreme Court, which discusses time limits for filing PCR petitions in California state courts, is applicable. *See* Nos. 65, 67 (citing *Robinson v. Lewis*, 469 P.3d 414, 424 (Cal. 2020)). However, as discussed above, New Jersey state law governs the timeliness of the PCR petitions here. California state law differs because it lacks any firm PCR filing deadline, meaning that "[w]hether a claim has been timely presented is assessed based on an indeterminate reasonableness standard," not (as in New Jersey) a definite, if occasionally extendable, deadline. *Robinson*, 469 P.3d at 416.[6]

Lastly, to the extent that Petitioner argues that his prior counsel's error in not filing his initial PCR in a timely manner entitles him to equitable tolling, the Court finds this argument unavailing. A prisoner "is 'entitled to equitable tolling' *only* if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Jenkins*, 705 F.3d at 89 (emphasis added); *see also Ardis*, 2018 WL 5617550, at *4 ("[W]e have expressly characterized equitable tolling's two components as 'elements,' not merely factors of indeterminate or commensurable weight.") (quoting *Menominee Indian Tribe of Wis. v. United States*, 136 U.S. 750, 756 (2016)). Here, Petitioner does not meet *Jenkins'* first requirement. As stated above, Petitioner admits he was aware of issues with his prior counsel when he filed his PCR petition in July 2005 and had the opportunity to raise these issues but chose not to do so. Thus, Petitioner did not act with reasonable diligence to pursue his rights, and he is not entitled to equitable tolling. *See*

---

[6] Even if this Court considers Petitioner's PCR appeal timely based on the Appellate Division's consideration of the merits of the appeal, the one-year AEDPA deadline to file Petitioner's habeas petition expired prior to the date that Petitioner filed that appeal. Under applicable law, the period between the actual PCR appeal deadline (here, October 15, 2007) and the filing of the accepted PCR notice of appeal (here, if accepted, January 9, 2008) counts toward the one-year AEDPA limitations period. *See Pagliaroli v. Johnson*, No. 18-9585, 2021 WL 3206789, at *3 (D.N.J. July 29, 2021) (citing *Evans*, 546 U.S. at 189, 191, 197, 200–01)). Thus, the one-year AEDPA deadline to file a habeas claim expired on November 20, 2007 (365 un-tolled days after his conviction became final) and Petitioner's instant claims, filed on December 6, 2010, are time-barred. *See Pagliaroli*, 2021 WL 3206789, at *3.

*Cristin v. Wolfe*, 168 F. App'x 508, 511 (3d Cir. 2006) (finding that counsel's "alleged failure to inform [the petitioner] that he was no longer representing her and that he was not filing a petition for allowance of appeal" did not entitle petitioner to equitable tolling).

### b. Appeal and Judgment Related Motions

Petitioner has also filed two more motions. First, Petitioner filed a motion to reopen the time to file an appeal, arguing that he did not receive notice of the April 5, 2021, termination of this action until after the time to appeal it had passed.[7] ECF Nos. 68–69. Petitioner's motion is unnecessary; there is no need to reopen Petitioner's time to appeal when the window never closed. If a party files a timely Rule 59 motion, "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." Fed. R. App. P. 4(A)(iv). Because a timely motion for reconsideration has been pending here (Petitioner's first, not his second), Petitioner's time to appeal never actually expired. In other words, his notice of appeal will take immediate effect.

Finally, Petitioner also filed a motion requesting entry of judgment. ECF No. 70. That motion is rendered moot by this decision.

## III. CONCLUSION

For the reasons set forth above, Petitioner's motions for reconsideration brought pursuant to Federal Rule of Civil Procedure 59(e) (ECF Nos. 58, 61) are **DENIED**. Petitioner's motion to reopen the time to file an appeal (ECF No. 69) and motion requesting entry of judgment (ECF No. 70) are also **DENIED**. An appropriate Order follows.

**DATED:** October 20, 2021

_____
**CLAIRE C. CECCHI, U.S.D.J.**

---

[7] The Clerk's Office closed this matter following the Court's dismissal of Petitioner's previous petition. ECF No. 56. Nevertheless, this matter is opened for purposes of rendering this decision.